COURT OF APPEALS
DECISION
DATED AND FILED

April 24, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.   2023AP1643**
                      **2023AP1644**
                      **2023AP1645**

Cir. Ct. Nos. 2022TP4
2022TP5
2022TP6

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT II**

---

**NO. 2023AP1643**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.G.O.,
A PERSON UNDER THE AGE OF 18:

KENOSHA COUNTY DIVISION OF CHILDREN AND FAMILY
SERVICES,

   PETITIONER-RESPONDENT,

 V.

M.A.M.,

   RESPONDENT-APPELLANT.

---

**NO. 2023AP1644**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO M.G.O.,
A PERSON UNDER THE AGE OF 18:

KENOSHA COUNTY DIVISION OF CHILDREN AND FAMILY
SERVICES,

**PETITIONER-RESPONDENT,**

V.

**M.A.M.,**

**RESPONDENT-APPELLANT.**

---

**NO. 2023AP1645**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO Z.G.O.,
A PERSON UNDER THE AGE OF 18:**

**KENOSHA COUNTY DIVISION OF CHILDREN AND FAMILY
SERVICES,**

    **PETITIONER-RESPONDENT,**

  V.

**M.A.M.,**

    **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Kenosha County: CHAD G. KERKMAN, Judge. *Affirmed.*

¶1 NEUBAUER, J.[1] M.A.M., referred to herein by the pseudonym Mary, appeals from orders terminating her parental rights to three of her children,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

J.G.O., M.G.O., and Z.G.O., referred to herein by the pseudonyms Jamie, Michael, and Zachary, and from orders denying her motions for postdisposition relief. Mary argues that her trial counsel provided ineffective assistance by admitting certain requests for admission and by failing to oppose a summary judgment motion filed by the Kenosha County Division of Children and Family Services (the County). She argues that these errors prejudiced her because they relieved the County of its burden to prove her unfitness by clear and convincing evidence. The circuit court disagreed, concluding that her trial counsel's conduct was consistent with a strategy agreed upon by Mary and her counsel not to oppose the grounds asserted by the County and instead to argue that termination was not in her children's best interests. For the reasons set forth below, this court concludes that Mary has not established the first prong of an ineffective assistance claim, deficient performance. In light of this conclusion, this court affirms the orders terminating her parental rights.

## BACKGROUND

### I.    Termination Proceedings

¶2    Termination of parental rights proceedings involve two phases:  the grounds phase and the dispositional phase. *See **Sheboygan Cnty. Dep't of Health & Hum. Servs. v. Julie A.B.**, 2002 WI 95, ¶¶24-28, 255 Wis. 2d 170, 648 N.W.2d 402. In the grounds phase, the finder of fact must determine whether the government establishes the ground or grounds it pleaded "for involuntary termination under WIS. STAT. § 48.415." **Tammy W-G. v. Jacob T.**, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854. If the factfinder determines that the government has established grounds to terminate under § 48.415, "the court shall find the parent unfit." WIS. STAT. § 48.424(4). The proceeding then enters the

second, dispositional phase, during which "the court is called upon to decide whether it is in the best interest of the child that the parent's rights be permanently extinguished." *See Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856; *see also* WIS. STAT. § 48.426(2).

¶3 In January 2022, the County filed petitions to terminate the parental rights of Mary and the father of then-five-year-old Jamie, seven-year-old Michael, and nine-year-old Zachary. (The father is referred to herein by the pseudonym Adam. Adam's appeals from the circuit court's orders terminating his parental rights are addressed in a separate opinion.) In affidavits attached to the petitions, social worker Katherine Schroeder explained that the children had been removed from Mary and Adam's home in January 2019 and had been found to be in need of protection or services under WIS. STAT. § 48.13(10) in June 2019. In July of that year, dispositional orders were entered placing the children outside their parents' home and imposing conditions the parents would have to meet before their children would be returned.

¶4 In the termination petitions, the County raised one ground to terminate Mary's parental rights—the children's continuing need of protection or services. *See* WIS. STAT. § 48.415(2). That ground requires proof of three things: (1) "the child has been adjudged to be a child … in need of protection or services and placed … outside his or her home pursuant to one or more court orders"; (2) "the agency responsible for the care of the child … has made a reasonable effort to provide the services ordered by the court"; and (3) "the child has been placed outside the home for a cumulative total period of 6 months or longer pursuant to an order listed under subd. 1. [and] the parent has failed to meet the conditions established for the safe return of the child to the home."

4

Sec. 48.415(2)(a)1.-3. Schroeder explained in her affidavits that despite the County's reasonable efforts to provide the services that had been ordered for Mary in 2019, Mary had failed to meet the conditions for the safe return of her children.

¶5 Mary appeared with her attorney, Brian Rolf, at a hearing on March 1, 2022, at which she denied the County's allegations and requested a jury trial. Later that month, the County served sets of 280 requests for admission under WIS. STAT. § 804.11. *See* WIS. STAT. § 48.293(4) (stating that "the discovery procedures permitted under [WIS. STAT.] ch. 804 shall apply in all proceedings under this chapter"). The requests addressed various topics, including events in the years preceding the children being removed from Mary and Adam's home, the events and circumstances that led to the children's removal from the home, and facts relevant to the children's continued need of protection or services. With Rolf's assistance, Mary admitted 259 of the requests. Among other things, Mary admitted that: (1) her children had resided outside her home for more than six months since entry of the dispositional orders in 2019; (2) the County had "made a reasonable effort to provide the services ordered by the court"; and (3) Mary had not met all the conditions for the safe return of her children.

¶6 The County subsequently moved for summary judgment, asserting that Mary's admissions established beyond genuine dispute the elements for termination on the ground of continuing need of protection or services. Mary did not file written responses to the County's motions. At a hearing in August 2022 at which Mary was present, Rolf informed the circuit court that Mary was "not objecting to … the Motions [f]or Summary Judgment at this time." The court granted the County's motions and later held a dispositional hearing at which Rolf argued that the court should terminate Adam's parental rights but not Mary's. The

court declined to do so, concluding that the factors pertaining to the best interest standard under WIS. STAT. § 48.426(3) "[were] overwhelmingly in favor of termination" of both parents' rights.

## II.    Postdisposition Proceedings

¶7      Following the entry of orders terminating her parental rights, Mary, through new counsel, filed a postdisposition motion alleging that Rolf had rendered ineffective assistance in admitting many of the County's requests for admission, which the circuit court relied on in granting summary judgment to the County in the grounds phase.  The court held a two-day evidentiary hearing on Mary's motion (and a similar motion filed by Adam).

¶8      Rolf testified at the hearing about his representation of Mary and the strategy they developed, which was based on her wish not to contest the grounds for termination and instead focus on Adam as "the real problem" in the family and urge the circuit court to terminate his parental rights but not hers:

> So [Mary] had made it very clear early … as we were discussing how we were going to proceed that she did not wish to actually have a full trial on this matter or even a bench trial.  That she didn't want kind of other people getting involved in that way.  And she didn't want to have the trial just in front of the judge.
>
> We had developed a strategy at the time, because we didn't know what [Adam] was doing, we were maintaining a trial posture.  But … our long-term plan at that time was that we were expecting to either enter a plea to the matter that she had not met the Conditions of Return or depending on how the State moved with the Request for Admissions and then go to the disposition and we were going to argue at disposition that the ongoing issues had been [Adam] in the case.
>
> That he was the real problem, the root of the problem.  That the only way to actively allow [Mary] to actually

6

> make real progress to be able to get the children back was to terminate his parental rights, but not [Mary]'s parental rights to allow her to continue going forward. Ultimately, that was the argument we made at the disposition as well.

Rolf testified that this strategy emerged early in the representation "when [he] presented her the different options that she could proceed with long-term and when she indicated she didn't want a trial [he] said, okay, well, then here's some kind of general strategies and general ideas that we can do." He confirmed that he explained "quite extensively" to Mary "the legal consequences of pleading to the grounds in the [p]etition." He also testified that he revisited the strategy with Mary "generally every time we spoke" to confirm that she still wished to pursue it and specific actions that would be taken pursuant to it. According to Rolf, Mary never told him she had changed her mind about the strategy.

¶9     Rolf denied that he had tried to talk Mary out of proceeding to trial in the grounds phase because that decision, in his view, belongs to the client, and he "generally [doesn't] try to influence clients on which way they should or shouldn't go. In that regard I just want to lay out [the] options," the likely arguments of the parties, how trials and pleas work, and the consequences of each.

¶10     Rolf testified that after receiving the County's requests for admission, he forwarded a copy to Mary and set up a meeting with her to discuss them. Before that meeting, Rolf reviewed the requests and "tr[ied] to match up every question with what was in the discovery" he had received from the County. He testified that he "spent a considerable amount of time explaining the process and what the requests were" as well as the legal effect of admissions to Mary at their in-person meeting and over the phone. He did so in part because a psychological evaluation ordered by the circuit court had revealed that Mary

suffered from multiple psychological and learning disorders, read at a fifth-grade level, and was impaired in both expressive and receptive vocabulary. Despite these impairments, Rolf described her behavior as "not atypical" compared to other parents he has represented in termination of rights proceedings.

¶11    Rolf also testified about the approach he took with respect to the requests for admission. He explained that if Mary disagreed with him as to how to respond to a particular request, they would discuss it, and if she disagreed with his recommendation, Rolf's "position as her attorney was that that was her answer and that I was to let her answer the question … that way then. Essentially deferring to her in those instances if she disagreed with it." As an example, with respect to the request concerning the County's efforts to provide court-ordered services to Mary, Rolf testified that he "spoke with [her] extensively on whether or not their efforts were reasonable" and "ended up going with an admission … not necessarily because [he] thought an admission was correct, but because she at the time indicated … that she felt that they had been reasonable in their efforts." Rolf confirmed that he explained the legal term "reasonable efforts" to Mary and believed she understood what it meant.

¶12    Similarly, Rolf testified that he and Mary decided not to oppose the County's summary judgment motions

> based partially on the strategy we had devised where [Mary] did not wish to have a trial. I explained to her that if we entered—if we objected or—to it and then entered a plea to the questions or if we didn't object to it, I explained how all that would have played out for the different cases. And, ultimately, we decided not to object … and move on to the disposition for the hearing to make the argument that it should only have been [Adam's parental rights] that should be terminated …."

¶13 At the conclusion of the hearing, the circuit court denied Mary's motion. The court found Rolf's testimony credible and that the requests for admission, which were answered by Mary, "were all answered appropriately with the exception of one or two that were in error" but which had "no material significance to the case." The court found that Rolf consulted with Mary about their strategy for the proceeding, that she did not want to have a trial in the grounds phase, and that "everything Attorney Rolf did was consistent with" the strategy Mary wanted to pursue. Based upon these findings, the court concluded that Mary had not shown that Rolf's performance was deficient or that she was prejudiced by it.

## DISCUSSION

¶14 Parents in termination proceedings have the right to effective assistance of counsel. *State v. A.S.*, 168 Wis. 2d 995, 1004-05, 485 N.W.2d 52 (1992). Ineffective assistance claims are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, Mary must prove two things: deficient performance and prejudice. *See id.* at 687. Deficient performance is that which falls "below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). Mary must show that Rolf made errors that were so serious that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See State v. Trawitzki*, 2001 WI 77, ¶40, 244 Wis. 2d 523, 628 N.W.2d 801 (citation omitted). To prove prejudice, Mary must show that Rolf's "errors were so serious as to deprive [her] of a fair [proceeding] whose result is reliable." *See Strickland*, 466 U.S. at 687. Mary "must show that there is a reasonable probability that, but for [Rolf]'s

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694.

¶15  In analyzing Mary's arguments, this court's review of Rolf's performance is "highly deferential." *See id.* at 689; **Harrington v. Richter**, 562 U.S. 86, 105 (2011). This court must attempt "to eliminate the distorting effects of hindsight" and evaluate his performance "from [his] perspective at the time." *See* **Strickland**, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

¶16  Ineffective assistance claims present mixed questions of law and fact. **State v. Jenkins**, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786. This court "uphold[s] the [trial] court's findings of fact, including the circumstances of the case and the counsel's conduct and strategy, unless they are clearly erroneous." *Id.* Whether counsel's performance meets the legal standard for ineffective assistance is "a question of law that this court decides de novo." **State v. Domke**, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364.

¶17  Mary contends that Rolf's performance was deficient in several respects. She argues first that Rolf was deficient in admitting several requests for admission that "had questions of fact and were dispositive of the entire case." Specifically, she points to the requests concerning whether the County made a

reasonable effort to provide the court-ordered services and whether Mary had met all of the conditions for return. Mary denies that she told Rolf to admit these requests and argues she had met some of the conditions, suggesting that a partial denial would have been appropriate. *See* WIS. STAT. § 804.11(1)(b) ("when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder"). She also contends that two of her other admissions were erroneous and that Rolf unreasonably interpreted (and admitted) several other requests that could have been denied.

¶18 These arguments are not sufficient to overcome the "strong presumption that [Rolf]'s conduct falls within the wide range of reasonable professional assistance." *See **Strickland***, 466 U.S. at 689. The record on Mary's postdisposition motion consists solely of Rolf's testimony, which the circuit court found credible. Mary did not testify, and there is no evidence that she told Rolf not to admit that the County had made reasonable efforts or that she had not met the conditions for return lacks support in the record. Thus, Mary's assertion to the contrary in her appellate brief lacks support in the record.

¶19 All that the circuit court (and this court) have to go on is Rolf's testimony that the responses to the requests for admission were crafted with Mary's input and pursuant to her desire not to have a trial in the grounds phase and instead to focus on making the case in the dispositional phase that only Adam's parental rights should be terminated. Rolf testified that he typically reviews a client's options at the outset of a representation and that Mary told him early in the representation that she wanted to avoid a trial. He confirmed that this remained Mary's goal throughout the grounds phase and explained that because the

11

responses were hers to make, he deferred to her when they disagreed on how to answer a request. As an example, Rolf testified that Mary decided to admit that the County had made reasonable efforts to provide court-ordered services, even though Rolf did not necessarily think that was the case, because Mary believed they had done so.

¶20 Having agreed to pursue a strategy of nonopposition during the grounds phase, Mary cannot now claim that Rolf rendered deficient performance by acting in furtherance of that strategy. *See, e.g.*, **State v. Mull**, 2023 WI 26, ¶49, 406 Wis. 2d 491, 987 N.W.2d 707 ("That a different trial strategy may look better in hindsight does not render a reasonable strategy deficient performance."); **State v. Eckert**, 203 Wis. 2d 497, 510, 553 N.W.2d 539 (Ct. App. 1996) (holding that client "does not receive ineffective assistance where defense counsel has discussed with the client the general theory of defense" and makes strategic decisions in furtherance of that strategy); **United States v. Weaver**, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel.").

¶21 Mary argues next that Rolf was deficient in not opposing the County's summary judgment motions, which she argues relied on numerous "irrelevant" responses to the requests for admission. She acknowledges Rolf's testimony that he did not oppose the motions because of the strategic decision he and Mary pursued not to have a trial in the grounds phase but argues that Rolf's failure to oppose the motions is not entitled to the deference normally accorded to such strategic decisions for two reasons. *See* **Strickland**, 466 U.S. at 690-91. First, she argues that the strategic goal, as articulated by Rolf, was actually to enter

a plea at the grounds phase, which was eliminated as a possibility when Rolf did not oppose the County's summary judgment motion. That is not an accurate reflection of Rolf's testimony: when asked specifically why he did not oppose the motions, Rolf reiterated that Mary's overarching goal was to avoid a trial, not to do so specifically by entering a plea. Rolf acknowledged that entering a plea was a possibility he discussed with Mary but stated that after the County filed its motions, she and Rolf made the decision not to oppose them so the proceeding could move to the disposition phase. Mary points to nothing in the postdisposition record which refutes that testimony or suggests that she directed Rolf to arrange a plea or that the County would have agreed to that resolution.

¶22     Second, Mary argues that an "ordinarily prudent attorney" would not have adopted Rolf's strategy. She contends "that she did not want to give up her right to a trial on the grounds" and that Rolf could have negotiated a "beneficial plea deal" or had Mary plead no contest, which would have required the County to prove the grounds by clear and convincing evidence. She also contends that Rolf offered shifting explanations of his efforts to negotiate a plea with the County.

¶23     Again, however, none of these arguments is supported by evidence in the record upon which this court could conclude that Rolf's performance was deficient. Mary's unsupported assertion that she did not want to relinquish her right to a trial is contrary to Rolf's sworn testimony to the contrary and thus not sufficient to render the circuit court's findings "that the trial strategy was to not have a trial and that was [Mary]'s position" clearly erroneous. Nor does Mary point to any evidence in the record to suggest that the County would have agreed to a "beneficial plea deal" for her. Finally, Mary provides no reason to believe that, had she pled no contest to the grounds, the County would have been unable to

13

prove by clear and convincing evidence the three elements needed to show that her children were in continuing need of protection or services. Her argument in this respect is entirely speculative.

¶24    For these reasons, this court concludes that Mary has not carried her burden to show that Rolf's performance was deficient. In light of this conclusion, this court need not address whether she has met her burden of establishing prejudice, the other element of an ineffective assistance claim. *See **State v. McReynolds***, 2022 WI App 25, ¶21, 402 Wis. 2d 175, 975 N.W.2d 265.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.